IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Dannetta Todd, | ) | C/A No. 4:09-1501-TLW-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Federal Express Corporation and FedEx | ) | |
| Express, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Dannetta Todd ("Todd" or "Plaintiff") is a former employee of Federal Express Corporation ("Defendant" or "FedEx") at its Myrtle Beach, South Carolina station (known as the MYRA station). FedEx terminated Plaintiff Todd on May 17, 2007, citing violations of corporate policy. Plaintiff Todd alleges FedEx wrongfully discharged her based on a pretextual, performance-related ground. Plaintiff Todd filed discrimination charges against FedEx with the Equal Employment Opportunity Commission ("EEOC") on December 11, 2007. Compl. ¶ 10, ECF No. 1. After receiving right-to-sue letters from the South Carolina Human Affairs Commission ("SCHAC") in February 2009 and the EEOC in April 2009, Plaintiff commenced this suit in June 2009, bringing causes of action for (1) age discrimination based on disparate treatment pursuant to the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. § 621, et seq., and S.C. Code Ann. § 1-13-80; (2) sexual harassment based on a hostile work environment and gender discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and S.C. Code §1-13-80; (3) retaliatory discharge pursuant to the ADEA, Title

VII, and S.C. Code § 1-13-80; (4) a state law claim for defamation; and (5) a state law claim for intentional infliction of emotional distress.[1]  *See* Compl.

This matter is before the court on Defendant's Motion for Summary Judgment on each of Plaintiff's causes of action. ECF No. 203. Plaintiff responded to the motion, ECF No. 222, and FedEx filed a reply, ECF No. 224. The court held a hearing on June 11, 2012. Having considered the parties' briefs and arguments, the undersigned submits this report[2] recommending FedEx's motion be granted.

## I.     Factual Background

Plaintiff was employed by Defendant as a courier at its MYRA station from February 19, 1995 until her termination on May 17, 2007. Todd Dep. 8, ECF No. 222-2.  At the time of her termination, Plaintiff was 41 years old. *Id.* at 172.  From 2000 until her termination, Operations Manager Dominic DiPalma ("DiPalma") was Plaintiff's direct supervisor.  DiPalma reported to Senior Manager Richard Hooss. Todd Dep. 13, ECF No. 203-3.  Hooss reported to the Piedmont District Director, Michael Saladino, and Saladino reported to the Regional Vice President, Ted Merida. *Id.* at 14-15.  Kristine Peasley[3] is the human resources advisor for the MYRA station. Peasley Dep. 6, 24, ECF No. 222-7. At the time of Plaintiff's termination, DiPalma was 40-years-old and Hooss was 48-years-old.  Peasley Decl. 7-8, ECF No. 203-7.

---

[1] Plaintiff's Complaint also included a cause of action for battery under South Carolina common law that the district court dismissed pursuant to the exclusivity provision of the South Carolina Workers' Compensation Act. *See* ECF No. 33.

[2] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28, U.S.C. § 636 (b)(1)(B) and Local Rule 73.02(B)(2)(g), D.S.C.  Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration.

[3] Kristine Peasley is also referred to as Mari K. Peasley. *See* Peasley Decl., ECF No. 203-7, and Peasley Dep., ECF No. 203-11.

A.  FedEx Performance Measures

At FedEx, couriers bid on vacant delivery routes through a formal process; they are awarded routes based on seniority.  Plaintiff bid on, received, and operated route 605.  Individual couriers, stations, and districts have performance goals; performance is measured in part by the number of delivery stops individual couriers make along their routes.  Each route has its own individually set goals. Hooss Dep. 78, ECF No. 203-5.  Stops-per-hour goals (delivery to customers) are productivity/efficiency measurements that a courier must achieve within a certain amount of time.  Accordingly, background information regarding what qualifies as a courier "stop" is important to understanding Plaintiff's claims and FedEx's position.

Information about a package, or "time-definite delivery," is part of the service FedEx provides to its customers. *Id.* at 35.  FedEx couriers are to utilize exception codes for certain situations they encounter on their routes. FedEx Delivery Exception Code ("DEX") 3 ("Code 3" or "DEX 3") is used for a wrong address. DEX 3 should only be used if the courier cannot find the address for the package because the address is wrong and the courier does not know where the address is located. Hooss Dep. 117, ECF No. 203-5.  Use of a DEX 3 code increases a courier's stop-count. *See* Moyles Dep. 52, ECF No. 203-12 (noting that "a delivery exception would be considered a stop.").  Use of a "Revenue Exception" or "REX" code to correct an address corrects the address, notifies the shipper, and charges the shipper a fee for the correction. Hooss Dep. 142-43, ECF No. 203-5.  Use of a REX code does not increase the courier's stop-count. Moyles Dep. 52, ECF No. 203-12. When DEX 3 is applied, and then followed by an REX scan, a surcharge is assessed against the shipper. Hooss Dep. 133, ECF No. 203-5. Deliveries, pickups, codes, and exceptions are inputted through a tracking device. Incorrect use of the tracking equipment can result in discipline to the courier. *See id.* at 122.

When a customer approaches a courier and asks the courier to accept a package for delivery, the courier is to contact dispatch to obtain a number for the package. Moyles Dep. 20, ECF No. 203-12. Customers are typically charged a pick-up fee for these "requested courier pickups," or "CRQs." The courier enters a CRQ code, which generates a record of the pick-up and credits the courier with a stop. Hooss Dep. 158, ECF No. 203-5. The courier will be credited for one stop for each customer who requests pickup, regardless of how many packages that customer has. Moyles Dep. 24, ECF No. 203-12.

Customers may also use drop boxes to deliver packages to FedEx at no extra charge. DiPalma Dep. 249, ECF No. 203-6. When a courier opens a drop box, the courier scans the drop box itself and is credited with one stop for the box, regardless of how many packages the drop box contained. *Id.* Under FedEx policy, both a DEX 3 (wrong address code) and CRQ (requested courier pickup) equal a stop. Moyles Dep. 52, ECF No. 203-12; Hooss Dep. 158, ECF No. 203-5.

B. Relevant FedEx Policies and Plaintiff's Knowledge Thereof

FedEx's policy manual and employee handbook contain copies of the FedEx policy prohibiting falsification of records. Peasley Decl. exs. D & G, ECF Nos. 203-9, 203-10. A copy of the FedEx policy manual is located in the break room at the MYRA station. DiPalma Dep. 214, ECF No. 203-6. Also included in the policy manual and employee handbook are FedEx's policies prohibiting employment discrimination. Peasley Decl. 7, ECF No. 203-7. FedEx provides an anonymous employee hotline, known as the "Alert Line," for reporting employment issues or complaints. Peasley Dep. 263-64, ECF No. 203-11; Todd Dep. 24-26, ECF No. 222-2.

On February 11, 2005, FedEx Regional Vice President Merida issued an "Acceptable Conduct Policy;" Plaintiff signed a copy of the Policy on March 1, 2005. The policy reminded

employees about the consequences for deliberate falsification of documents, including delivery records. Todd Dep. 224 & ex. 12, ECF No. 203-4. On August 25, 2005, Merida issued a memorandum noting that employees continued to lose jobs because of decisions to enter false information on a delivery record or time card. Plaintiff signed that memorandum on September 9, 2005. *Id.* at 225 & ex. 13. On June 2, 2006, Plaintiff signed a memorandum acknowledging that falsification of delivery records, among other things, "will normally result in an immediate suspension, pending investigation and probably termination." *Id.* at 225-26 & ex. 14. On February 2, 2007, Plaintiff was counseled about proper coding of exception packages. Hooss Dep. 120, 124 & ex. 11, ECF No. 203-5.

C. Events of April and May 2007

On April 28, 2007, Plaintiff discovered that DiPalma was issued a seatbelt violation and the address on his driver's license matched the address of Sally Hall ("Hall"), a subordinate employee who reported directly to DiPalma. Todd Dep. 62-63, ECF No. 222-2. Plaintiff did not report this information to FedEx via the Alert Line. *Id.* at 168.

On May 11, 2007, which was 13 days after Plaintiff obtained the information concerning DiPalma and Hall, she was suspended for allegedly violating Defendant's Acceptable Conduct Policy. *Id.* at ex. 18, ECF No. 222-2 (ex. 18 avail. at p. 68 of ECF 222-2).

FedEx began investigating Plaintiff's alleged wrongful conduct after a Charlotte, North Carolina-based FedEx dispatcher Sam Dismukes called DiPalma on May 3, 2007, and reported that he could hear a drop box open and shut while Plaintiff was calling in multiple CRQ stops. DiPalma Dep. 242-43, 246-47, 280, ECF No. 203-6. DiPalma testified that the dispatcher called him just after hanging up from his phone call with Plaintiff. *Id.* at 246. After the call, DiPalma checked the central computer and found the CRQ scans that Plaintiff had requested from the

dispatcher. The computer report did not include a single scan for the drop box. *Id.* at 247. DiPalma called his senior manager, Hooss, who contacted human resources advisor Peasley. *Id.* at 248, 320. On May 11, 2007, at the direction of Peasley, DiPalma suspended Plaintiff with pay pending investigation for allegedly violating the company's Acceptable Conduct Policy. *Id.* at 281. DiPalma had initially drafted a warning letter to Plaintiff. *Id.*, ex. 54. However, the draft warning letter was not issued because Hooss and Peasley reviewed the information and made the decision to terminate Plaintiff's employment. *Id.* at 321-22.

On May 17, 2007, DiPalma called Plaintiff into his office and terminated her for falsification of delivery records. Plaintiff was terminated because she failed to accurately record her stop times and locations on her delivery manifest by placing a DEX 03 code on multiple business stops. Todd Dep. ex. 21, avail. at p. 38 of ECF No. 222-2.

FedEx offers employees a Guaranteed Fair Treatment ("GFT") appeals process, allowing employees to challenge any issued discipline, including termination. The appeals process has three steps. Plaintiff utilized the GFT process to appeal her termination. Her appeal was reviewed and upheld by three levels of management: Piedmont District Director Saladino upheld the termination at Step 1 on June 13, 2007; Regional Vice President Merida upheld the termination at Step 2 on July 20, 2007; and the Appeals Board upheld the termination at Step 3 on August 22, 2007. Todd Dep. exs. 25, 30, 32, ECF No. 203-4.

II.    Discussion

A.    Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is

appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62

(4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact).

A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a prima facie case of a violation of Title VII, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). In the absence of direct evidence, the same burden-shifting framework applies to discrimination claims brought pursuant to the AEDA. *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006).

B.  Analysis

Plaintiff brings claims of gender and age discrimination, sexual harassment based on a hostile work environment, and retaliatory discharge, as well as several state-law causes of action. FedEx moves for summary judgment as to all of Plaintiff's causes of action.

1. Gender Discrimination

According to her Complaint, Plaintiff's gender discrimination cause of action arises from her "allegations of sexually harassing remarks and actions and from the subjection of the Plaintiff to sexual and verbally harassing work environment."[4] Compl. ¶ 90. Plaintiff also alleges that other couriers, including male couriers, were not terminated for using the DEX 3 code in the same way that she used it. *See* Pl.'s Mem. Opp'n ["Pl.'s Resp."] 14, ECF No. 222. In response to the court's inquiry at the hearing on the pending motion, Plaintiff submitted that she has a "multiple-based" claim. Through her counsel, Plaintiff explained that females were discriminated against in these ways: they were treated differently and given extra work when they complained; and they were sexually harassed (and men were not). Further, Plaintiff argued that she and other women in the workplace who did not cooperate with DiPalma and who rebuffed his advances were treated less favorably than women who did cooperate with DiPalma and did not rebuff his advances.

To establish a prima facie case of gender discrimination under Title VII, a plaintiff must prove: (1) she is a member of a protected class; (2) she was performing satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment. *Davis v. Centex Homes*, C/A No. 4:09-830-RBH-SVH, 2011 WL 1525764, at *4 (D.S.C. Apr. 1, 2011) (citing *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) *adopted*, 2011 WL 1526928 (Apr. 20, 2011). Defendant concedes that Plaintiff met the first and third elements—that she was a member of a protected class who suffered an adverse employment action. Def.'s Mem. Supp. Summ. J. ["Def.'s Mem."] 18, ECF No. 203-1. However, Defendant contends that Plaintiff was not performing her job satisfactorily and that she

---

[4] The court considers Plaintiff's claims of sexual harassment and hostile work environment separately.

has not shown that similarly-situated male employees received more favorable treatment. The court considers these in turn.

        a.   Satisfactory Job Performance

In determining whether an employee has met an employer's legitimate job expectations, it is the employer's perception that is relevant, not the employee's self-assessment. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)). "The relevant time to evaluate [ ] an employee's performance is at the time of the adverse action." *Wells v. Briggs Constr. Equip. Inc.*, C/A No. 3:08-3634-JFA-PJG, 2010 WL 2991673, at *4 (D.S.C. May 12, 2010) (citing *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005)), *adopted,* 2010 WL 2991681 (Jul. 28, 2010).

Defendant argues that Plaintiff cannot satisfy this second element because of the reasons for her termination. FedEx terminated Plaintiff's employment after determining that she falsified delivery records by inflating her delivery stops and pickups. Def.'s Mem. at 20. FedEx warned employees that there was "zero tolerance" for falsification and that the consequence for the first offense for falsification was termination; Plaintiff signed three separate memoranda acknowledging her understanding of this policy. *See* ECF No. 203-4 at 64, 67, 69 (exs. to Todd Dep discussed above). On July 7, 2006, Plaintiff received written counseling regarding her job performance. *Id.* at 71. On February 2, 2007, Plaintiff was counseled about proper coding of exception packages (DEX 03), and warned that further incidents would result in further discipline. ECF No. 203-5 at 76. On May 11, 2007, Defendant suspended Plaintiff pending investigation of violation of its Acceptable Conduct policy. ECF No. 203-4 at 73. After conducting the investigation, on May 17, 2007, Defendant terminated Plaintiff for falsification of delivery records. The termination letter noted that "during the week of April 30, 2007, you failed

to accurately record your stop times and locations on your delivery manifest by placing a DEX 03 on multiple business stops. Review of your delivery records indicates that these stops are businesses that you deliver to on a regular basis. In addition these codes were placed on several stops only one (1) minute apart from each other." *Id.* at 75.

Plaintiff counters that her superior performance review scores in 2005 and 2006, coupled with a March 2007 checkride performance evaluation with no negative results indicated her job performance was satisfactory. Pl.'s Resp. at 13; *see also* Pl.'s Performance Reviews, avail. at pp. 16, 35, and 54 of ECF No. 222-18. While Plaintiff's evaluations from her early term of employment have no bearing on her performance, the court may consider her performance reviews at the time of her termination. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006) (holding evidence of past work performance did not alter the "abundant evidence" showing that the plaintiff was not otherwise meeting the employer's legitimate job expectations at the time of discharge); *but see Shumpert v. Mancor Carolina, Inc.*, No. 3:00-2480-22BD, 2004 WL 3583987, at *3 (D.S.C. Mar. 10, 2004) (citing *Brown v. Chicago Transit Auth.*, No. 97-7041, 1999 WL 495622, at *5 (N.D. Ill. June 28, 1999) (finding that plaintiff's performance at and around the time of her termination, not the specific incident that may have precipitated her termination is the proper question to consider in determining whether plaintiff can establish the satisfactory performance element of her prima facie case). Plaintiff also refers to positive comments from DiPalma and other FedEx personnel as evidence of satisfactory performance. Pl.'s Resp. at 14. However, whether Plaintiff's coworkers "may have thought that [she] did a good job or that [she] did not 'deserve' [to be discharged], is close to irrelevant." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir. 1991) (alterations in original)).

In considering Defendant's Motion for Summary Judgment, the court considers all evidence in the light most favorable to Plaintiff. Applying that standard here, the undersigned is of the opinion that a reasonable jury could find that—aside from the incident related to the falsification of delivery records—Plaintiff's job performance satisfied FedEx's legitimate job expectations. Accordingly, the court considers the remaining element of Plaintiff's prima facie gender discrimination claim: whether similarly situated male employees were treated more favorably.

### b. Similarly situated male employees

"To be similarly situated, a 'plaintiff must establish that other employees were similarly situated in all relevant respects; that they dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Johnson v. City of N. Myrtle Beach*, No. 4:09-2530-TLW-TER, 2012 WL 848038, at *8 (D.S.C. Jan. 25, 2012) (quoting *Ward v. City of N. Myrtle Beach*, 457 F.Supp.2d 625, 643 (D.S.C.2006), *adopted,* 2012 WL 847276 (Mar. 13, 2012).

In support of its motion, Defendant argues that Plaintiff failed to identify any male employee, or employee under age 40, who falsified delivery records and yet was not terminated. Def.'s Mem. at 18. FedEx provides information compiled by Peasley, the human resources advisor for the Piedmont District to support its argument. Peasley's Declaration indicates that in the Piedmont District during the time period from March 2005 through April 2008, 25 couriers were terminated for first offense falsification of delivery records. Of those terminated employees, 19 were men. Peasley Decl. 4, ECF No. 203-7.

In arguing she has set forth sufficient evidence to establish this element of her prima facie case of gender discrimination, Plaintiff contends that, at the time she was terminated, male couriers at MYRA station were using the DEX 03 code in the same manner she was using it, but that the male couriers were not disciplined, terminated, or accused of engaging in falsification. Pl.'s Resp. 14. In support, Plaintiff submits the statement of Jason Reed, a male courier at the MYRA station, whom Plaintiff says has "admitted that he was using the DEX 03 code in the same way Plaintiff was using it but was not terminated, disciplined, or accused of falsification." *Id.* at 15; *see* Reed Ltr., avail at p. 67 of ECF No. 222-12. In his letter, Reed states that employees were told to correct packages with incorrect addresses or zip codes "prior to a delivery, and never have we been told that this could be considered falsification." *Id.*

As an initial matter, the court notes that the statement by Reed is inadmissible hearsay and therefore Plaintiff may not rely upon it to establish gender discrimination. *Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995) ("[E]vidence [that] consists of inadmissible hearsay . . . is neither admissible at trial nor supportive of an opposition to a motion for summary judgment."); *see also* F.R. Civ. P. 56(c)(2).

Even if the letter were admissible, Reed's letter does not provide Plaintiff with the evidence she needs to survive Defendant's summary-judgment challenge as to this element. Reed's letter does not demonstrate that his conduct was similar to Plaintiff's in all respects. *See Johnson*, 2012 WL 848038, at 9. Reed never admitted in his statement that he falsified records and Plaintiff has not provided evidence of any other employee who falsified records and was not terminated. Moreover, Defendant argues that Plaintiff was not terminated for simply using the DEX 03 code, which is the same code used by Reed, but was terminated for falsification of delivery records. *See* Def.'s Reply 2, ECF No. 224.

"A plaintiff charging an employer with disparate discipline must show the decisionmaker 'consciously overlooked' misconduct by others outside the protected class 'when he disciplined [plaintiff] more severely'. . . . And 'unless [the decisionmakers] knew of the [comparators' misconduct] the events cannot be considered in determining whether [plaintiff and his comparators] are similarly situated.'" *Johnson*, 2012 WL 848038, at 9.

FedEx expects its couriers to use delivery codes when justified, but falsification of delivery records is a terminable offense. *See* Def.'s Reply 3, ECF No. 224. Even assuming Plaintiff's facts as true, the court finds Plaintiff has not set forth facts sufficient to show that similarly situated, male employees engaged in conduct similar to Plaintiff's but received more favorable treatment.

Because Plaintiff has presented no admissible evidence that a similarly situated male employee was not terminated after falsifying delivery records, she cannot establish a prima facie case of gender discrimination. Because Plaintiff has not established a prima facie case, Defendant is under no duty to supply an explanation for her termination. *King*, 328 F.3d at 150 (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999) ("*Once the prima facie case is established, the burden shifts to the employer* to articulate a legitimate, nondiscriminatory reason for the adverse employment action.") (emphasis added in *King*)). Similar to the analysis of the Fourth Circuit Court of Appeals in *King*, "[b]ecause [Defendant] is freed from having to justify the discharge (with respect to the discrimination claims), [Plaintiff's] evidence-in-waiting, prepared to rebut any justification, is of no moment." *Id.* Therefore, the undersigned submits that Defendant is entitled to summary judgment as to Plaintiff's Title VII claim for gender discrimination.

## 2. Sexual Harassment

Plaintiff's Title VII sexual harassment cause of action includes allegations of a hostile work environment. *See* Compl. ¶¶ 69-84. Title VII states that "[i]t shall be an unlawful employment practice for any employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). Because the environment of the workplace is a term or condition of employment, Title VII creates a hostile work environment cause of action. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 73 (1986); *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).

To survive a motion for summary judgment on her claim of sexually hostile work environment in violation of Title VII, Plaintiff must show that there is a genuine issue of material fact as to whether the offending conduct (1) was unwelcome; (2) was based on her sex; (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment; and (4) was imputable to her employer. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003).

As Plaintiff correctly noted in her response, in "determining whether conduct was unwelcome, '. . . the correct inquiry is whether respondent, by her conduct, indicated that the alleged sexual advances were unwelcome.'" Pl.'s Resp. at 6 (quoting *Meritor Sav. Bank*, 477 U.S. at 68). "Whether or not discrimination was based on sex, the proper inquiry involves assessing whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (citing 42 U.S.C. § 2000e-2(a)(1)).

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree*, 335 F.3d at 333. First, Plaintiff must show

that she "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993). Next, Plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment hostile or abusive. *Oncale v. Sundownder Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998).

Whether an environment is objectively hostile or abusive depends on factors such as: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. This standard is designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotation omitted). "Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006). "Harassment reaches the sufficiently severe or pervasive level when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim herself subjectively perceive[s] . . . to be abusive.'" *Jennings v. Univ. of N.C*, 482 F.3d 686, 696 (4th Cir. 2007) (quoting *Harris*, 510 U.S. at 21).

Plaintiff alleges the following conduct as examples of inappropriate behavior by DiPalma that occurred throughout the time he was her supervisor:

- "On one occasion, Plaintiff was in the break room at the MYRA station eating a biscuit. When Plaintiff commented that the biscuit did not have much meat on it, Mr. DiPalma responded that he had some meat for Plaintiff and acted like he was going to unzip his pants." Pl.'s Resp. 7 (citing Todd Dep. 51-52, ECF No. 222-2).

- "On another occasion, Mr. DiPalma came up behind Plaintiff, put his hands around her, grabbed each of her breasts, and pushed his pelvic area against her, while she was standing at the board where schedules are posted in the MYRA station." Pl.'s Resp. 7-8 (citing Todd Dep. 85-86, ECF No. 222-2).

- "On yet another occasion, DiPalma picked Plaintiff up and threw her into a trash can, located at the MYRA station. In order to get Plaintiff out of the trash can, he grabbed her between her legs and by her arm." Pl.'s Resp. 7 (quoting Todd Dep 87, ECF No. 222-2).

- "Mr. DiPalma also made offensive comments to Plaintiff[, often] call[ing] Plaintiff 'stupid[,]' [and   ] when Plaintiff would forget the password she had created in order to use the company computer, [] DiPalma would reset it to 'stupid.'" Pl.'s Resp. 8 (quoting Todd Dep. 61, 211, ECF No. 222-2).

- "DiPalma inappropriately touched and rubbed against Plaintiff during the entire time he was her supervisor." Pl.'s Resp. 8 (quoting Todd Dep. 179, ECF No. 222-2).

Defendant argues that Plaintiff's failure to complain of the purported sexual harassment undermines any claim of severity. Defendant also asserts the alleged actions and comments by DiPalma occurred over a period of years, and therefore, were not pervasive.

Plaintiff admits she did not complain or report the sexual harassment. When asked what she said to DiPalma when he allegedly grabbed her breasts and rubbed against her, Plaintiff testified: "I don't recall exactly what I said. I might have said 'stop' laughingly and 'go away.' I don't know how I reacted." *Id.* at 110. At the hearing in this matter, counsel asserted that Plaintiff "rebuffed" DiPalma. However, a review of the record, specifically including Plaintiff's deposition testimony, her EEOC complaint, and her declaration, does not indicate Plaintiff ever

specifically rebuffed DiPalma. In fact, when asked directly during her deposition whether she "rebuffed [DiPalma's] advances," Plaintiff testified that she did not recall telling him directly. Todd Dep. 161, ECF No. 222-2. Rather, she testified that she would "pretend like it didn't happen." *Id*. Plaintiff stated that DiPalma often invaded her personal space and touched her inappropriately, but she never said anything to him, never reported his conduct, and never made a report on the employee Alert Line. *Id.* at 179-80.

In opposing summary judgment, Plaintiff cites the depositions of other female employees who testified as to DiPalma's sexually harassing behavior towards them, and male employees who testified to observing such behavior. *See* Pl.'s Resp. 8-9. FedEx employee Michael Wehunt testified that he saw DiPalma press his body against another female employee, but that DiPalma stopped after realizing Wehunt was watching him. Wehunt Dep. 105-06, ECF No. 222-13. Wehunt recalled the trash can incident involving Plaintiff, but stated that it was horseplay.

> They'd be, you know, smoking crew, joking around and all that, and it was a more laid-back place back then. You could joke and everything and not worry about it as long as you didn't go too far. Dominic, unfortunately, liked to go too far. And I did see him pick [Plaintiff] up, take her to a trash can, just kind of horsing around, I guess you'd call it, and yeah, I did see that.

*Id.* at 107. Those were the only two incidents that Wehunt could recall. *Id.* at 108.

FedEx has written policies prohibiting sexual harassment. *See* Peasley Decl. 7, ECF No. 203-7. DiPalma was trained by FedEx on its employment policies and completed training on sexual harassment awareness. *Id.* Defendant's Alert Line provides employees with an anonymous way to report employment issues or complaints, and someone in the human resources department investigates issues raised through the Alert Line. Peasley Dep. 263-64, ECF No. 203-11.

Plaintiff testified that she was aware of the Alert Line and that she knew that it was a toll-free number available 24-hours-a-day. Todd Dep. 24-26, ECF No. 222-2. She testified that she called the Alert Line for the first time around Christmas 2006 to discuss favoritism shown by DiPalma to Sally Hall based on their alleged sexual relationship. *Id.* at 27-28. Plaintiff testified that she did not report the incident regarding DiPalma grabbing her breasts to anyone at FedEx, nor did she report other inappropriate conduct by DiPalma. *Id.* at 113, 180, 185-86.

> According to circuit precedent, "evidence that the plaintiff failed to utilize the company's complaint procedure will normally suffice to satisfy [the company's] burden under the second element of the defense." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267 (4th Cir. 2001) (internal quotation marks omitted) (alteration in original). If Title VII's prohibitions against sexual harassment are to be effective, employees must report improper behavior to company officials. *See Faragher*, 524 U.S. at 806, 118 S. Ct. 2275 (observing "that a victim [of sexual harassment] has a duty to use such means as are reasonable under the circumstances to avoid or minimize the damages that result from violations of the statute") (internal quotation marks omitted); *Parkins v. Civil Constructors, Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998) (observing that "the law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists") (internal quotation marks omitted). Otherwise, the harasser's conduct would continue, perhaps leading other employees to infer that such behavior is acceptable in the workplace. *See Barrett*, 240 F.3d at 267.

*Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 269 (4th Cir. 2001) (alterations in original).

Employers are not liable for an employee's unlawful harassment of another employee if the harassed employee has unreasonably refused to report or has unreasonably waited many months before reporting a case of actual discrimination. *See Barrett*, 240 F.3d at 267-68; *see also Matvia,* 259 F.3d at 269-70 (finding employee cannot forestall reporting a workplace harasser in order to "collect evidence" against him so long as the conduct was actionable, i.e., that it was unwelcome, based on the employee's gender, "and sufficiently pervasive or severe to alter the

conditions of employment"). Plaintiff did not complain about DiPalma's behavior toward her until after she was terminated. Plaintiff testified that she was satisfied with the performance review scores she received from DiPalma. Todd Dep. 237-38.

Further, Plaintiff argued for the first time at the hearing that DiPalma's behavior interfered with her work performance because it marginalized her on the job site and undercut her respect and her well-being with the other employees. However, at the hearing and throughout the litigation, Plaintiff has also argued in support of her satisfactory job performance that she was considered a stellar employee, both by co-workers and management. *See, e.g*., Pl.'s Resp. 13. Plaintiff's own arguments belie any indication that she was marginalized on the job.

Plaintiff alleged that the favoritism and preferential treatment shown toward her co-worker, Sally Hall, also created an uncomfortable and hostile work environment. Compl. ¶¶ 75-76. The Fourth Circuit has held that favoritism does not establish sexual harassment. *Becerra v. Dalton*, 94 F.3d 145, 149-50 (4th Cir. 1996) (finding that allegation of sex discrimination based on alleged favoritism bestowed on employee lover or paramour is not actionable under Title VII); *see Ahern v. Omnicare ESC, LLC*, No. 5:08-CV-291-FL, 2009 WL 2591320, *5 (E.D.N.C. Aug. 19, 2009) (citing *Becerra* and collecting cases); *see also Evans v. Williamsburg Tech. Coll.*, 4:03-3939-TLW, 2007 WL 1068183 (D.S.C. Mar. 29, 2007) (noting claims of favoritism not actionable under Title VII). Accordingly, the undersigned finds that any claims that favoritism shown toward Hall because of her relationship with DiPalma created a sexually hostile work environment are not actionable.

The undersigned further finds that Defendant took reasonable care to prevent and correct sexually harassing behavior by providing sexual harassment training, and a mechanism for reporting sexually harassing behavior. Plaintiff failed to take advantage of preventative or

corrective opportunities when she did not report DiPalma's conduct. The undersigned concludes that while a reasonable jury could find DiPalma's conduct was unwelcome and based on Plaintiff's sex, it would not find that it was "sufficiently severe or pervasive to alter the conditions of her employment" or imputable to FedEx.

Because Plaintiff has not presented competent evidence to support this essential element of her hostile-work-environment/sexual harassment claim, it should be dismissed.

### 3. Age Discrimination

Plaintiff's ADEA claim is for disparate treatment, based on her allegation that she was discriminated against on the basis of her age. *See* Compl. ¶¶ 54-61. The ADEA addresses age-related employment issues by making it "unlawful for an employer—(1) to fail or refuse to hire . . . any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a prima facie case of age discrimination under the ADEA, a plaintiff must prove the following: (a) she is an employee covered by the ADEA; (b) she has suffered an unfavorable employment action by an employer covered by the ADEA; and (c) the unfavorable employment action occurred "under circumstances in which the employee's age was a determining factor in the action in the sense that but for her employer's motive to discriminate against her because of her age, she would not (have suffered the action)." *Graham v. Columbia Coll.*, No. 3:10-01852-MBS, 2012 WL 1072231 (D.S.C. Mar. 30, 2012) (internal quotations and citation omitted). "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action. The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some

evidence that age was one motivating factor in that decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

FedEx argues that there is no inference of unlawful discrimination for several reasons. Defendant alleges that Plaintiff was terminated for a legitimate, non-discriminatory business reason—falsification of delivery records; other employees under the age of 40 were also terminated for falsification of business records;[5] the decision-makers who terminated Plaintiff's employment were over the age of 40; an employee hired after Plaintiff was over age 40; Plaintiff admitted there were objective reasons she was asked to assist a younger courier; and no age-related comments were made to Plaintiff.

Plaintiff asserts in her Complaint that older and more experienced workers were discriminated against because they were required to do more tasks than "younger and less experienced workers." Compl. ¶¶ 55-57. Plaintiff seeks to avert summary judgment on her age discrimination claim by proceeding under the *McDonnell Douglas* framework. ECF No. 222 at 18-19. She argues that the record establishes a prima facie case of age discrimination, and Defendant's proffered reason for her termination was pretextual. *Id.* at 19-21. However, Plaintiff has not established a prima facie case of age discrimination because she has provided no evidence that her age was the motivating factor in her termination.

> Regardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.' To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that 'the protected trait . . . actually

---

[5] FedEx Human Resources Advisor Peasley provided gender and age information for 25 couriers terminated for falsification of delivery records from March 18, 2005 until August 22, 2008. Of those terminated, 11 were younger than Plaintiff. Peasley Decl. 4, ECF No. 203-7.

motivated the employer's decision.' The protected trait 'must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (internal citations omitted).

Plaintiff identified only one employee younger than she whom she alleges was treated differently because of age. Todd Dep. 116, ECF No. 203-3. Plaintiff testified that she was told to help that employee by pulling packages from his assigned drop boxes. *Id.* Plaintiff was unable to recall if she asked for help from her manager or dispatch to assist with that employee's route. Todd Dep. 117-18. Plaintiff was unable to articulate why she believed she was terminated because of her age: she testified that no one at FedEx made age inappropriate comments toward her, and she testified that despite her age, she believed FedEx would have terminated her anyway. Todd Dep. 170-73, ECF No. 203-3. Based on the record before the court, no reasonable jury could find that, but for Plaintiff's age, she would not have been terminated. *See Gross*, 557 U.S. at 176. Her ADEA claim therefore fails.

### 4. Retaliation

Plaintiff also claims a Title VII violation for retaliatory discharge. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Absent direct evidence proof of retaliation, in order to establish a prima facie case for retaliation under Title VII, a plaintiff must show the following: (1) that she engaged in a protected activity; (2) that the employer took an adverse employment action against her; and (3) that a causal

connection existed between the protected activity and the asserted adverse action." *Matvia*, 259 F.3d at 266. If Plaintiff is able to establish a prima facie case for retaliation, Defendant can rebut the presumption by articulating a legitimate non-retaliatory reason for its action. Discussing a defendant's burden, the South Carolina District Court has explained: "What shifts is merely a burden of producing admissible evidence (something more than a pleading) that would, if believed, be legally sufficient to justify a judgment for the defendant." *Taylor v. Ingles Markets*, C.A. No. 802407227, 2004 WL 3591133, *5 (D.S.C. Dec. 13, 2004) (citing *Tex. Dept. of Cmty. Affairs*, 450 U.S. at 255). The employer, however, does not have the burden of persuading the court that it was actually motivated by the proffered reason. *Id.* "The employer's burden is satisfied if he simply 'explains what he had done' or 'produce[es] evidence of legitimate, nondiscriminatory reasons.'" *Williams v. Sonoco Prods. Co.*, C.A. No. 81-1469-0, 1982 WL 423, at *3 (D.S.C. Nov. 8, 1982) (citing *Bd. of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 25 (1978)). A plaintiff bears the final burden of proving that the reason given by a defendant is a pretext for unlawful retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). In *Reeves*, the Supreme Court clarified a plaintiff's burden to show pretext once the employer articulates a legitimate reason for its adverse action. The Court held that a plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. *Reeves*, 530 U.S. at 143. "The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." *Reeves*, 50 U.S. at 146 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)). "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the

defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148.

An employee engages in protected activity when he opposes discriminatory practices in the workplace or participates in an investigation, proceeding or hearing under Title VII. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id.* Title VII's anti-retaliation provision not only protects activity in opposition to employment actions actually unlawful under Title VII, but also employment actions an employee reasonably believes to be unlawful. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406-07 (4th Cir. 2005).

The court considers whether Plaintiff has established a prima facie claim of retaliatory discharge by examining each element.

### a. Prima Facie Case

First, Plaintiff must show that she engaged in a protected activity. *Matvia*, 259 F.3d at 266. Plaintiff asserts that when she reported to FedEx personnel that the address on DiPalma's driver's license matched the address of Sally Hall, she was engaging in protected activity. Pl.'s Resp. 24.[6] She claims this information provided "tangible evidence" that DiPalma and Hall were involved in an inappropriate relationship. Todd Dep. 168, ECF No. 222-2. Plaintiff asserts this was discriminatory conduct because the favoritism shown to Hall contributed to the creation of a

---

[6] Plaintiff also argues that other FedEx employees made "[n]umerous reports regarding [the DiPalma/Hall] relationship, the favorable treatment, and the hostile environment that existed, at the MYRA station[,] and that those reports "constituted participation in a protected activity." Pl.'s Resp. 23. Actions of others cannot prove that Plaintiff "participated in a protected activity."

hostile work environment.[7]  Pl.'s Resp. 23.  However, Plaintiff provides no evidence that, prior

to her termination, she reported the information about DiPalma's address to anyone at FedEx.

*See Hooven-Lewis v. Caldera*, 249 F.3d 259, 273 (4th Cir. 2001) (noting plaintiff's informal

contact with EEOC officials would be "protected activity" if the accused knew of the activity).[8]

"An employee can honestly believe she is the object of discrimination, but if she never mentions

it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of

any complaints."  *Miller v. Am. Fam. Mut. Ins.*, 203 F.3d 997, 1008 (7th Cir. 2000).  Plaintiff

testified in her deposition that she did not call the Alert Line, Todd Dep. 168, ECF No. 222-2.

Further, she was not able to articulate to whom she actually told the information or what they did

with that information.

> Q.  You mentioned you told a couple of people. Do you recall their names?
> A.  Not off the top of my head.
> Q.  Whoever you told, did they tell you they went and told Mr. DiPalma?
> A.  Oh, no. No Sir.
> Q.  You're just making the assumption they went and told Mr. DiPalma?
> A.  My opinion. Correct.
> Q.  Did Mr. DiPalma tell you in either the suspension hearing you had with him, any other follow-up meetings you had with him while you were on investigative suspension or the termination meeting you had with him that he was aware that you had this tangible evidence?
> A.  No, he did not.
> Q.  Have you seen any documents, ma'am, that indicate to you that Mr. DiPalma was aware that you had this tangible evidence prior to your termination?
> A.  I don't understand what—what does that mean, "documents?"
> Q.  Have you seen it written anywhere that Mr. DiPalma knew about this tangible evidence—
> A. No.
> Q.  –before you were fired?

Todd Dep. 169, ECF No. 222-2.

---

[7] As discussed above, the Fourth Circuit has held that favoritism does not establish sexual harassment. *Becerra*, 94 F.3d 145.

[8]    As discussed within, the issue of DiPalma's knowledge is also relevant to whether Plaintiff can satisfy the causal-connection element of her prima facie case.

To support her position that she was engaging in a protected activity with regard to the DiPalma-Hall relationship, Plaintiff cites FedEx Policy 4-50 for the proposition that a romantic relationship between an individual in a managerial role and a directly reporting subordinate employee is a terminable offense. Pl.'s Resp. 23. However, the court notes that the cited policy refers only to employment of persons related by blood or marriage, not those involved in a romantic relationship.[9]

Considering these facts, Plaintiff's showing that she engaged in protected activity with respect to her reporting of DiPalma's address is weak. Nonetheless, reviewing the evidence in the light most favorable to Plaintiff, the undersigned is of the opinion that a reasonable jury may determine that Plaintiff opposed an activity she believed to be unlawful. Accordingly, the court also considers other aspects of Plaintiff's prima facie case.

The second element Plaintiff must prove is that the employer took an adverse employment action against her. Because Plaintiff was terminated, there is no question but that the second element is satisfied.

The third element Plaintiff must establish to prove a prima facie retaliation case is that a causal connection exists between the protected activity and the employment action. In considering causal connection, the Fourth Circuit has held that "[v]ery little evidence of a causal connection is required to establish a prima facie case [of retaliation]." *Burgess v. Bowen*, No. 10-2081, 2012 WL 517190, at \*10 (4th Cir. Feb. 17, 2012) (citing *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998) (overruled on other grounds)). Further, "temporal proximity

---

[9] "Policy: FedEx Express hires and promotes the best qualified individuals for every job opening. Blood-related and marriage-related employees may be hired and be permitted to work at the same locations, providing no direct reporting or supervisory relationship [exists]. Scope: All employees related by blood or marriage." Policy 4-50, Employment of Relatives, ECF No. 222-14.

between the protected activity and the employer's adverse action alone will suffice[.]". *Burgess*, 2012 WL 517190, at *10 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) and *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004)).

Thirteen days after discovering the information about DiPalma's address, Plaintiff was suspended for violation of company policy, and subsequently terminated for falsification of company documents. Plaintiff submits this provides the requisite causal connection.

It is undisputed that Plaintiff was terminated on May 17, 2007, less than a month after she discovered what she deemed to be a discriminatory practice. However, the reporting of her falsification of delivery records by the FedEx dispatcher constitutes an intervening event between her discovery and termination.[10] *See Christy v. City of Myrtle Beach*, No. 4:09-1428-JMC-TER, 2012 WL 2149777, at *7 (D.S.C. Apr. 26, 2012) (citing *Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 852 (8th Cir. 2005) (holding that "intervening events eroded any causal connection suggested by the temporal proximity of [the employee's] protected conduct and her layoff"), *adopted*, 2012 WL 2149780 (Jun. 13, 2012).

Further, as discussed above, Plaintiff has not provided evidence that she informed anyone at FedEx of her findings regarding DiPalma and Hall. In addition, Plaintiff has not provided evidence that DiPalma was aware that she had reported his living arrangement with Hall prior to her termination. *See Baqir v. Principi*, 434 F.3d 733, 478 (4th Cir. 2006) (holding plaintiff had not established a prima facie retaliation case because he had not shown that relevant officials of

---

[10] At the hearing, Defendant argued that, even if Plaintiff's complaint about DiPalma's living arrangement could be considered protected activity, three intervening events occurred that were not related to her complaint. First, on May 1, 2007, Plaintiff falsified delivery records; second, Plaintiff falsified customer request pick-ups; and third, the dispatcher in North Carolina called DiPalma. *Id.*

his employer were aware of his participation in protected activity at the time the claimed retaliation took place).

Plaintiff submits that a remark DiPalma made to her after her termination demonstrates retaliatory motive and a causal link. Pl.'s Resp., ECF No. 222 at 24. She submits that, as DiPalma escorted her out of the facility, he came up behind her and whispered in her ear, "See what happens when you f—k with me?" Todd Dep. 49-50, ECF No. 222-2. Other than simply stating that DiPalma's comment establishes the causal link, Plaintiff does not explain how that comment evidences that his motivation to terminate her derived from his knowing she had reported his and Hall's living arrangements to FedEx. In reviewing her deposition testimony, the court notes that Plaintiff admitted she "had no idea what [DiPalma] was talking about" when making that comment. Todd Dep. 50-51, ECF No. 222-2. In addition, DiPalma testified that he was unsure who had reported the living arrangement. DiPalma Dep. 24, ECF No. 222-15. When asked if he had an idea, he suggested that Plaintiff may have reported the information *after* she was terminated, and reported the information to FedEx because she was upset that she got terminated. *Id.*

The undersigned is of the opinion that Plaintiff's evidence of a causal connection is weak. DiPalma's alleged parting comment to her notwithstanding, the court agrees with Defendant that any causal connection was broken by her actions. Nonetheless, giving Plaintiff every benefit of the doubt at this stage, the undersigned considers whether Defendant has articulated a legitimate, non-discriminatory reason for its actions for any prima facie case Plaintiff has established.

b. Pretext

Defendant maintains that Plaintiff's termination for falsification of company documents is a legitimate non-discriminatory reason unrelated to her sex, age, and any alleged protected

activity. Def.'s Mem. 29. Here, assuming Plaintiff established a prima facie case for retaliation, the undersigned finds she has not set forth sufficient evidence to demonstrate Defendant's explanation for her termination was merely pretextual. *See Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2005) (noting if a plaintiff puts forth a prima facie case of retaliatory discharge, defendant must offer a nondiscriminatory explanation for the termination and then the burden of proof returns to plaintiff to show the employer's proffered explanation is pretextual).

Plaintiff argues that other couriers were using the DEX 03 code in the same manner as she but were not terminated for such use. However, FedEx provided information showing that other employees who falsified documents were also terminated. Plaintiff also asserts that during the internal appeals process, no attempts were made to verify the accuracy or validity of the documents and/or reports submitted by DiPalma. Pl.'s Resp. 26 (citing deposition testimony of FedEx Executive Operations Manager Michael Whitley in support of her allegations). Whitley Dep. 5, 165, ECF No. 222-11.

The court has reviewed Whitley's testimony, however, and finds it does not support Plaintiff's argument. Whitley's testimony was that he did not know whether the human resources advisor verified the information; he did not state unequivocally that the information was not verified. *Id.* at 165. "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanations' validity. . . ." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). "[I]t is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette*, 133 F.3d at 299. Plaintiff cannot show that Defendant's stated reason for terminating her was not the real reason for her discharge.

Even if the issues cited by Plaintiff could constitute a showing by a preponderance of the evidence that Defendant's stated reason was untrue, the ultimate question is whether Defendant unlawfully retaliated against Plaintiff. *See Reeves*, 530 U.S. at 146. "It is not enough to disbelieve the [employer]." *Love-Lane v. Martin*, 355 F.3d 766, 788 (4th Cir. 2004). Plaintiff must show a reasonable jury could "believe [her] explanation" of why she was terminated. *Id.* Here, Plaintiff's explanation of why she was terminated is that Defendant retaliated against her for reporting DiPalma's relationship with a subordinate employee. As discussed above, however, Plaintiff is merely speculating about what FedEx or DiPalma knew when. She has provided no evidence that she reported the relationship to anyone at FedEx. Plaintiff argued at the hearing that DiPalma said in deposition that she reported the information to FedEx prior to her termination. However, that is not DiPalma's testimony. DiPalma testified that he *thought* Plaintiff reported the information *after* she was terminated, and reported the information to FedEx because she was upset that she had been terminated. DiPalma Dep. 24, ECF No. 222-15.

Plaintiff has insufficient evidence to show Defendant's articulated reason for her termination was pretextual, and there is no support for a speculative inference that retaliation for her discovery of the DiPalma-Hall relationship was motivation for her discharge. Because she cannot carry the requisite burden of proof in this regard, Plaintiff's cause of action for retaliatory discharge should fail.

5. Plaintiff's Remaining Claims

a. SCHAL Claims

Plaintiff's Complaint also includes claims based on South Carolina's Human Affairs Law ("SCHAL"), S.C. Code Ann. § 1-13-10, *et seq. See generally* Compl. Defendant argues these claims fail for the same reasons the Title VII and ADEA claims fail. Def.'s Mem. 1-2, n.1. The

undersigned agrees. *See Gilchrist v. Parth's Inc.,* No. C/A 4:10-3034-JMC, 2011 WL 6842992 (D.S.C. Oct. 3, 2011); *Orr v. Clyburn*, 290 S.E.2d 804, 806 (S.C. 1982) (noting SCHAL essentially follows the substantive structure of Title VII and that cases interpreting Title VII are given persuasive if not binding authority).

It is recommended that Defendant's Motion for Summary Judgment be granted as to Plaintiff's SCHAL claims based on the reasons discussed above in connection with her Title VII and ADEA claims.

b.  Defamation

Plaintiff also brought a state-law defamation claim against Defendant for allegedly making "defamatory statements" about her, "including statements that she was falsifying records." Compl. ¶ 103. In her Complaint, Plaintiff averred that the defamatory statements "clearly implied that Plaintiff was incompetent to perform the duties of an employee and were made to impeach the honesty, integrity and reputation of Plaintiff." *Id.* She submits that the alleged defamatory statements were "further compounded by" positions Defendant took before the EEOC and claims the statements were "intended to injure" Plaintiff's credibility and were damaging to Plaintiff's reputation. *Id.* ¶¶ 104-05. She claims Defendant acted with ill will and malice in making these statements, which Defendant knew to be false. Id. ¶¶ 105-06.

Defendant seeks summary judgment on the defamation claim, arguing Plaintiff cannot establish the essential elements of defamation because information about Plaintiff's termination was truthful.  Defendant considers Plaintiff's termination letter the only supposedly defamatory communication, *id.* at 31, and notes that Plaintiff's Complaint contains no allegation that Defendant inappropriately published Plaintiff's termination letter or evidence of Plaintiff's alleged falsification of business records, *id.* at 30. In addition, Defendant submits that the

statements at issue are privileged because they were made in good faith and in the ordinary course of business. *See* Def.'s Mem. 30-32. Further, Defendant argues Plaintiff has provided no evidence of defamation per se, malice, or special damages. *Id.* at 32-33.

In response, Plaintiff argues Defendant defamed her by making untrue statements that she was falsifying records, which impliedly indicated she was not a competent employee. *Id.* at 4, 28-31. She submits the statements regarding her being terminated for record falsification are untrue because that was not the real reason for her termination. *Id.* at 28. She argues that Defendant's statements constitute defamation per se, meaning she need not show they were made with malice and she need not establish damages. *Id.* at 30. Plaintiff also takes issue with Defendant's characterizing the termination letter as the only allegedly defamatory statement at issue. Pl.'s Resp. 29-30. She submits that Defendant "wrote defamatory statements about [her] in her termination letter as well as made defamatory statements about [her] to her coworkers and customers." *Id.* at 30. Plaintiff submits that issues of fact exist regarding whether Defendant defamed her, making summary judgment inappropriate.

To prove defamation under South Carolina law, a plaintiff must prove the following: (1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Erickson* v. *Jones Street Publishers, L.L.C.,* 629 S.E.2d 653, 664 (S.C. 2006). Defamatory communications can take two forms: libel and slander. Slander is a spoken defamation, while libel is a written defamation or one accomplished by actions or conduct. *Swinton Creek Nursery* v. *Edisto Farm Credit*, 514 S.E.2d 126 (S.C. 1999).

Defendant first argues for summary judgment because the statements in Plaintiff's termination letter were true. Def's Mem. 30. In response, Plaintiff argues that she "has provided evidence sufficient to show that the statements Federal Express made, regarding her termination and alleged falsification of company documents, both in her termination letter as well as to her co-workers and customers, were not true." Pl.'s Resp. 30. However, Plaintiff points to no specific evidence in support of her argument. Certainly, the court is mindful of Plaintiff's contentions that record-falsification was not the actual reason Defendant terminated her. As fully discussed above in connection with her Title VII claims, though, the court finds that Defendant has provided more than ample evidence that it terminated Plaintiff for falsification of delivery records.

Further, Plaintiff has not offered competent evidence that Defendant "published" statements outside of the corporate managerial structure that could be considered defamatory. Plaintiff generally cites to several letters and deposition exhibits as apparent support for her argument that "both Plaintiff's co-workers and customers were told that Plaintiff had been terminated because she falsified company records." Pl.'s Br. 28-29; *see also id.* at 4.

However, review of these records do not support Plaintiff's claim. She is required to prove publication of the allegedly defamatory statements. *See Erickson*, 629 S.E.2d at 664 (defamation elements include the unprivileged publication to a third party). The evidence she includes in opposition to summary judgment consists mainly of statements from prior co-workers[11] that they believed she was a good worker and that they "heard" she had been

_____

[11] For these purposes, the court assumes, but does not decide, that publication to other employees could be considered publication to a "third party." *Cf. Bell v. Evening Post Publ'g Co.*, 459 S.E.2d 315, 317 (S.C. App. 1995) (finding communications between officers or agents of the same corporation generally enjoy a qualified privilege). This assumption for purposes of this motion is not intended as a ruling on the issue and should not be cited as such.

terminated for using improper codes. *See, e.g.*, Dep. of Pl.'s former co-worker Colleen Moore 82-83, ECF No. 222-16 (indicating she learned Plaintiff had been fired for using certain codes, but noting she "didn't know who [she] was talking to" at the time); May 31, 2007 Ltr. from Julie Babson Stanley, ECF No. 222-17 at 80 (writing on behalf of a client corporation that she "was notified that [their] local driver, [Plaintiff], was terminated[,]'" and sharing their praise for Plaintiff's service); (May 31, 2007 Ltr. from Steven L. Kramer, ECF No. 222-17 at 82 (writing on behalf of client, noting he had "recently learned [Plaintiff] had been terminated"). This evidence does not establish Defendant provided the information regarding Plaintiff's termination. *See Rivers v. Bank of Am.*, C/A No. 9:10-1654-MBS-BM, 2011 WL 7461917, at *9 (D.S.C. Aug. 12, 2011) *adopted*, 2012 WL 729250 (Mar. 6, 2012). This is insufficient proof of publication. *See Williams v. Lancaster Cnty. Sch. Dist.*, 631 S.E.2d 286, 292-93 (S.C. App. 2006) (disallowing claim because plaintiff could not prove defendant had published allegedly defamatory remark outside of privileged scenario; evidence that unflattering rumors had reached the public's attention were not sufficient).

Because Plaintiff has provided no proof of an unprivileged publication to a third party, her claims of defamation must fail. The undersigned recommends summary judgment in favor of Defendant as to this cause of action.

c.   Intentional Infliction of Emotional Distress ("IIED")/Outrage

Defendant argues that it is entitled to summary judgment as to Plaintiff's cause of action for IIED because that cause of action is precluded by the exclusivity provision of the South Carolina Workers' Compensation Act ("WCA"), S.C. Code Ann. § 42-1-540,[12] and Plaintiff has

---

[12] In denying Defendant's motion to dismiss the IIED claim, the court found that such claims typically fall within the WCA's exclusivity provisions, but indicated further factual development was required  *See* Order (Mar. 29, 2010) at 2-4, ECF No. 33.

not presented facts sufficient to remove this cause of action from the exclusivity provision. Alternatively, Defendant argues it is entitled to judgment as a matter of law on the merits of the IIED claim. Plaintiff argues she has established facts sufficient to remove the IIED claim from the WCA's exclusivity provision and that she has shown sufficient facts to survive summary judgment. The court agrees with Defendant.

Claims for IIED are governed by the WCA's exclusivity provision unless certain exceptions exist. Relevant to this matter, the exclusivity provision will not bar Plaintiff's pursuit of her IIED claim only if the IIED resulted "from the intentional act of the employer or its alter ego." *Edens v. Bellini*, 597 S.E.2d 863, 867 (S.C. App. 2004). The "alter-ego" exception was first recognized in *Dickert v. Metro. Life Ins. Co.*, 428 S.E.2d 700, 701 (S.C. 1993), in which the court defined an employer's "alter ego" to be its "dominant corporate owners and officers." *Id.* at 701.

Defendant submits Plaintiff's IIED claim does not involve a dominant owner/officer, and, accordingly, the exclusivity provision bars Plaintiff's tort claim. Def.'s Mem. 33, n.1. Defendant submits that there is no authority that a failure to investigate claims or to reinstate Plaintiff would be sufficient to establish an IIED claim or remove the claim from the WCA's exclusivity provision. *Id.*

Plaintiff argues that the alleged failure of Defendant's "upper management" to investigate Plaintiff's claims caused her emotional distress because she had trusted that her claims of "harassment, favoritism, discrimination, and retaliation" would have been thoroughly investigated and Defendant would have determined the reason for Plaintiff's termination was false. Pl.'s Resp. 32-33. In support of her claim that Defendant's "alter ego" intentionally inflicted emotional distress upon her, Plaintiff submits that her claim submitted through

Defendant's Guaranteed Fair Treatment Process ("GFTP") was not thoroughly investigated and that the purpose of the GTFP "is not to guarantee fair treatment." Pl.'s Mem. 33 (citing Whitley Dep. 154-56 (avail. at ECF No. ECF No. 222-11); Nov. 17, 2011 Dep. Def.'s Human Resources Advisor, Dianne Hollingsworth 5-52 (avail. at ECF No. 222-31)). More specifically, Plaintiff cites a portion of Hollingsworth's deposition in which she explained that the "purpose and measure of fairness" contemplated by the GFTP is for the employee to have had "the right to raise his or her concerns and facts that support his or her position all the way through the managing director, the vice president, the senior vice president and the appeals board with the executive officers, including the CEO." Hollingsworth Dep. 32, ECF No. 222-31.

The undersigned finds Plaintiff has not provided sufficient evidence to demonstrate Defendant's "owner(s) and officer(s)" set out with a "deliberate or specific intent to injure" Plaintiff. *Bellini*, 597 S.E.2d at 870; *see also Peay v. U.S. Silica Co.,* 437 S.E.2d 64 (S.C. 1993). In *Peay*, the Supreme Court of South Carolina answered a certified question from federal court and determined that "only those injuries inflicted by an employer who acted with a deliberate or specific intent to injure are exempted from the exclusive remedy of [the WCA.]" *Id.* at 65-66 (internal citations omitted). In so determining the court specifically rejected the argument that an employer may have "intended" to harm an employee if the employee did not desire harmful consequences but knew that such consequences were "substantially certain" to result. *Id.*

Plaintiff's argument seems to be that her treatment was not "fair," and her claim was not thoroughly investigated by FedEx through the GFTP process. She apparently seeks to demonstrate the involvement of Defendant's "alter ego" in the process by noting that the GFTP includes review by executive officers, including the CEO. As a matter of law, the undersigned finds Plaintiff has not presented facts sufficient to prove Defendant's "alter ego" was involved in

considering her termination for purposes of potential IIED liability. Because the WPA's exclusivity provision applies, the undersigned recommends Defendant's be awarded summary judgment as to Plaintiff's IIED claim.

Alternatively, the undersigned finds as a matter of law that Plaintiff cannot establish genuine issues of material fact that Defendant's conduct, by and through its agents, rose to the level necessary to constitute outrage for purposes of her IIED claim.

To maintain a claim for IIED, Plaintiff must establish the following:

(1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct;

(2) the conduct was so extreme and outrageous so as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community;

(3) the actions of the defendant caused plaintiff's emotional distress; and

(4) the emotional distress suffered by plaintiff was so severe that no reasonable man could be expected to endure it.

*Hansson v. Scalise Builders of S.C.*, 650 S.E.2d 68, 70 (S.C. 2007) (internal citations and quotations omitted). As explained by the Supreme Court of South Carolina in *Hansson*, "the court plays a significant gatekeeping role in analyzing a defendant's motion for summary judgment[]" in order to prevent claims for [IIED] from becoming a panacea for wounded feelings rather than reprehensible conduct[.]" 650 S.E. 2d at 72 (internal quotations and citations omitted). The *Hansson* court noted that a plaintiff alleging an emotional distress claim bears a "heightened standard of proof." *Id.*

In the employment context, mere termination or unpleasant conduct by supervisors does not rise to the level of actionable outrage. *See, e.g., Alonso v. McAllister Towing of Charleston, Inc.*, 595 F. Supp. 2d 645, 649-50 (D.S.C. 2009) (dismissing as a matter of law plaintiff's claim

for intentional infliction of emotional distress because of termination and noting "having one's employment terminated is a stressful experience, but it can hardly be said to be an act so severe that no reasonable person could be expected to endure it.") (internal quotation omitted). Plaintiff has not demonstrated that her termination or Defendant's conduct concerning her termination or her GFTP claim rises to the level of actionable IIED. Summary judgment for Defendant is appropriate.

III.    Conclusion

For the foregoing reasons, the undersigned recommends that Defendant's Motion for Summary Judgment, ECF No. 203, be granted and this case be dismissed.

IT IS SO RECOMMENDED.


July 16, 2012                                          Kaymani D. West
Florence, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**